IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANN HEFFERNAN, | : | Case No. 1:13cv001 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART DEFENDANT'S |
| U.S. BANK NATIONAL | : | MOTION FOR SUMMARY |
| ASSOCIATION, | : | JUDGMENT |
| | : | |
| Defendant. | : | |

Plaintiff Ann Heffernan brings this action against her former employer, Defendant U.S. Bank National Association ("U.S. Bank"), claiming age and disability discrimination under federal and Ohio law, Family and Medical Leave Act ("FMLA") interference and retaliation, and Employee Retirement Income Security Act ("ERISA") interference and retaliation, all in connection with her allegedly wrongful termination.  Defendant moves for summary judgment as to all of Plaintiff's claims.

For the following reasons, Defendant's Motion for Summary Judgment (Doc. 19) is **DENIED** as to Plaintiff's age discrimination claims and **GRANTED** as to all other claims.

## I.    BACKGROUND[1]

Plaintiff Heffernan worked for Defendant U.S. Bank and its predecessor entities for over forty years, beginning in 1968 and ending with her termination in December 2011 at the age of sixty-three.  She held a number of different positions with the bank during her long tenure.  She worked her way up to branch manager by 1988, and she served in that capacity at two different branches until 2005 when she stepped down to the role of floating branch manager because she

---

[1] Except as otherwise indicated, background facts are drawn from Defendant's Proposed Undisputed Facts (Doc. 32) to the extent those facts are admitted in Plaintiff's response thereto (Doc. 33).

no longer wanted the full responsibility that the branch manager position entailed.  (*See* Heffernan Dep. 32, Ex. 1, Doc. 11 at PageID 75, Doc. 24 at PageID 1021.)  The last position she held was that of assistant branch manager at the Procter & Gamble ("P&G") Sharon Woods banking facility (hereinafter, the "Sharon Woods Branch").  It is undisputed that throughout the course of her career her performance and attendance was good.

Plaintiff contends that she was terminated for unlawful reasons related to her age, alleged disability and medical problems, and because of her proximity to attaining eligibility for substantial benefits.  Defendant, on the other hand, claims she was terminated for a serious violation of bank policy in which she authorized the forced balancing of a subordinate's teller drawer.  Facts relevant to both positions are recounted below.

**A.  Heffernan's Knee Surgeries, Medical Leave, and Alleged Continuing Disability**

Plaintiff provides little information about her medical issues, and it is unclear from the record when and how Heffernan first developed knee issues.  What is disclosed is that she had two "bad knees" as early as 2006.  (Heffernan Dep. 16, Doc. 11 at PageID 59.)  Prior to that time, Heffernan had worked as a floating branch manager, a position that required her to travel between the ten banking facilities within her district to fill vacancies as needed.  (*Id*. at 15–16, Doc. 11 at PageID 58–59.)  She first injured one of her knees when she fell as work during the course of her work as a floating manager.  (*Id*. at 32–33, Doc. 11 at PageID 75–76.)  In 2006, U.S. Bank eliminated that position, and Heffernan became the assistant branch manager of the P&G Mason and the Governor's Hill branches.  (*See id*. at 16, 20–21, Doc. 11 at PageID 59, 63–64.)

2

In her deposition, Heffernan indicated that at different points over the course of the next several years, she was offered a promotion to branch manager.  (*Id*. at 28, Doc. 11 at PageID 71.) In the context of those discussions, she told three different district managers, including Barbara Sugatin and Tim Speight, that she "was unable to perform the role of Branch Manager due to the limitation of her knees."  (*Id*. at 26–27, Doc. 11 at PageID 69–70.)  Specifically, she stated that she "just couldn't be on [her] feet all day long . . . [a]nd as far as going out and calling on, you know, different businesses and stuff like that, it was just—I just couldn't do it [because] it was painful."  (*Id*. at 28, Doc. 11 at PageID 71.)

Heffernan had two knee surgeries in 2010, and she requested FMLA leave for both surgeries.  U.S. Bank approved both requests.[2]  She took six to seven weeks of leave for each surgery.  (*Id*. at 36, Doc. 11 at PageID 79.)  She did not experience any problems upon returning to work on either occasion.  (*Id*. at 36–37, Doc. 11 at PageID 79–80.)  At some point after the second surgery, Heffernan transferred to the assistant branch manager position at the Sharon Woods Branch.  (*Id*. at 37, Doc. 11 at PageID 80.)

With regard to the post-surgery status of her knees, Heffernan testified as follows:

> Q.     So since you've had your knees replaced in 2010, what health problems have you had with your knees?
>
> A.     I didn't follow doctor's orders from the beginning.  He wanted to replace them a year before, and I didn't do it.  I waited.  And my knees were in terrible shape.  And he told me, the longer I waited, that the worst, you know, it would be for me to recoup and, I guess, to get the full benefit of having new knees.  And I was just a hard-headed individual who didn't have it done.

---

[2] She had also taken a number of medical and FMLA leaves before that.

> Q.      Did you ever get the full benefit of having two new knees?
>
> A.      Well, I mean, other than I know my knees aren't going to give out on me anymore like they did before.  It's just still sometimes very painful if I have to walk a long distance.  Going up and down stairs is still difficult for me.  Getting new parts doesn't always mean that they're going to work good.
>
> Q.      Okay. So other than being painful if you go up and down stairs or walk long distances, is there any other problems with your knees since you had them replaced?
>
> A.      I mean, I think just the typical things that you have. Cold weather affects them real bad.  Cold, rainy days are really bad.

(*Id*. at 96–97, Doc. 11 at PageID 139–40.)

The only restriction Heffernan had upon returning from work was that she could not go up and down stairs.  (*Id*. at 98, Doc. 11 at PageID 141.)  She gave a letter from her doctor documenting that restriction to Sugatin, who was her supervisor at that time.  (*Id*.)  The only aspect of Heffernan's job that she cited as involving stairs was when she was required to work in an evening call center in Norwood.  (*Id*. at 75, 98, Doc. 11 at PageID 118, 141.)  Sugatin told Heffernan that she could make her calls from a different location if it was too difficult for her to navigate the stairs at the call center.  (*Id*. at 75, 99, Doc. 11 at PageID 118, 142.)  However, Heffernan continued to go to the call center because she "didn't want to be known as somebody who was not able to do what [she] was being told and asked of to do."  (*Id*. at 99, Doc. 11 at 142.)

4

### B.      Heffernan's Termination

The events immediately preceding and ostensibly leading to Heffernan's termination began on October 27, 2011 with an unbalanced bank drawer.  At that time, Heffernan was working as the assistant branch manager at the Sharon Woods Branch.  The Sharon Woods Branch has two offices—a main branch and a smaller satellite office that typically is staffed with only one individual.  (Aardema Dep. 11, Doc. 15 at PageID 484; Heffernan Dep. 11, Doc. 11 at PageID 54.)  Prior to Heffernan's termination, the branch was staffed with three people: Branch Manager James Aardema, Assistant Branch Manager Heffernan, and Banker[3] Debra Bryant.[4] (Heffernan Dep. 13–14, 18–20, Doc. 11 at PageID 56–57, 61–63.)  Aardema and Bryant primarily worked out of the main office, while Heffernan worked at the satellite office.  (*Id*. at 11, 13–14, Doc. 11 at PageID 54, 56–57.)  As assistant branch manager, Heffernan performed both management and banking duties, including processing loans, opening accounts, and operating a teller drawer.  (*Id*. at 22, Doc. 11 at PageID 65.)  She occasionally was responsible for supervising Bryant when Aardema was not present.  (*Id*. at 22–23, Doc. 11 at PageID 65–66.)

### 1.      U.S. Bank's Policies on Auditing Bank Drawers, Correcting Errors, and Forced Balancing

Heffernan, like all U.S. Bank employees, was responsible for understanding the policies and procedures relevant to her position.   (Heffernan Dep. Ex. 2 at 2, Doc. 24 at PageID 1024.)

---

[3] According to Human Resources Manager Steve Phillips, in 2009, U.S. Bank changed the designation of all "tellers" to "bankers" in order to represent the new expectation that they not only are responsible for customer service but also for selling products to customers.  (*See* Phillips Dep. 44, Doc. 17 at PageID 700.)  Accordingly, the parties and witnesses sometimes use the terms "banker" and "teller" interchangeably.  For the sake of consistency in this order, the Court uses the term "banker" when referring to individuals who at the time of their employment were designated as tellers or bankers.  The Court uses the term "teller" as appropriate when quoting testimony or documents and when referring to physical objects such as "teller tape," for which the term "teller" is used as a descriptor.

[4] Bryant was born in 1960. (Doc. 29-1 at PageID 1122.)

U.S. Bank provided extensive compliance training to Heffernan, she received and was required to review the Code of Ethics and Business Conduct every year, and she had access to employee manuals and handbooks. (*Id*. at 16–17, Doc. 11 at PageID 59–60; Bittner Dep. 13–14, Doc. 14 at PageID 384–85.)

Of particular importance in this case are U.S. Bank's policies and practices regarding the daily accounting of bank drawers, the correction of banking errors, and the practice of "forced balancing." One way that the bank ensures accountability is by requiring bankers to keep the same drawer every day. (*See* Bittner Dep. 61–62, Doc. 14 at 432–33.) Cash from each banker's drawer is stored in a locked vault that only is accessible to the banker assigned to the drawer or through a detailed dual-control procedure requiring keys, a combination, and two bank employees. (*Id*. at 43, Doc. 14 at PageID 414; Speight Dep. 57–58, Doc. 18 at PageID 787–88.) Employees are prohibited from conducting transactions on or accessing another banker's drawer because each banker is responsible for his or her own drawer. (Cope Dep. 27–28, Doc. 31 at PageID 1183;[5] Bittner Dep. 61–62, Doc. 14 at 432–33.) The assignment of a specific drawer to each banker allows the operations department to audit a drawer and investigate an error even if it is not found on the same day it is made. (Bittner Dep. 61–62, Doc. 14 at PageID 432–33.)

Bankers are responsible for checking the balance status of their drawers at the end of each day. Bankers count the cash left in their drawer, record the totals on a balance sheet, and enter the totals into a balancing program called Wizard Teller on their computer. (*Id*. at 18, Doc. 14 at PageID 389; Cope Dep. at 20–21, Doc. 31 at PageID 1181–82; Lewis Dep.[6] at 41, Ex. 2,

---

[5] Darlene Cope, born in 1958, was a banker at U.S. Bank at the time of Heffernan's termination. (Cope Dep. 6, Doc. 31 at 1178.)

[6] Kari Lewis, born in 1981, has worked for U.S. Bank since 1999 and has held the position of vice president/regional operations manager since 2006. (Lewis Dep. 5, 7, Doc. 16 at PageID 543, 545.) In that role, she manages several

Doc. 16 at PageID 579, Doc. 22 at PageID 933–46; Speight Dep. 54, Doc. 18 at PageID 784.[7])

The Wizard Teller program guides bankers through the balancing process and alerts them if they

are out of balance. (Bittner Dep. 18, Doc. 14 at PageID 389; Lewis Dep. at 41, Doc. 16 at

PageID 579; Lewis Dep. Ex. 2, Doc. 22 at PageID 933–46.)  At that point bankers have two

options.  They can accept the difference and request a further investigation into the issue, or they

can conduct a review to determine whether they could identify errors like miscounting cash or

mistakes in their paper work that would explain the imbalance.  (Bittner Dep. 18–19, 22, Doc. 14

at PageID 389–90, 393.)   A review typically would involve a branch manager or assistant

branch manager and would include the following:

- Recounting the cash;

- Comparing the cash with the balance sheet;

- Reviewing the  "proof work" (the physical paperwork that results from customers cashing
  checks, making deposits, or conducting other banking operations);[8] and

- Reviewing the banker's journal or teller tape, which includes a register of the transactions
  the banker processed that day.

---

[7] operations specialists, including Heather Bittner, whose primary duties include "ensur[ing] branches are mitigating risk through taking action and training to avoid losses, teller cash over/short differences." (*Id*. at 16, Doc. 16 at PageID 554.)

[7] Tim Speight, born in 1970, is and was at the time of Heffernan's termination the District Manager of the Midwest onsite district, which includes the Sharon Woods Branch.  (Speight Dep. 6, 8–10, Doc. 18 at 736, 738–40.)  Twelve branch managers report to him.  (*Id*. at 9, Doc. 18 at PageID 739.)  Speight reports to Divisional Manager Dan Hoke. (*Id*.)

[8] U.S. Bank reviews each banker's proof work on a daily basis as a matter of course.  (Bittner Dep. 19–20, Doc. 14 at PageID 390–91.)  This review functions as another stop-gap to identify and correct any errors that a banker may not have caught.  Each banker's proof work is collected and sent through a courier at the end of each day to a processing center in Cincinnati.  (*Id*. at 19, Doc. 14 at PageID 390.)  A processing center employee then reviews the proof work for each drawer to ensure it matches the transactions recorded through the banker's computer.  (*Id*. at 19–20, Doc. 14 at PageID 390–91.)  If there are any inconsistencies, a report is generated and sent to the cash balancing or "CORR" (Controller, Operations, Research and Reconciliation) department for further investigation. (*Id*. at 20, 23, Doc. 14 at PageID 391, 394.)

(Bittner Dep. 18–19, 22, Doc. 14 at PageID 389–90, 393; Speight Dep. 54–56, 87, Doc. 18 at PageID 784–86, 817; Cope Dep. 21–22, Doc. 31 at PageID 1182; Lewis Dep. 42–43, Doc. 16 at PageID 580–81.)  Bankers who find a difference of $100 or more are required to print a "trial balance" and give that document to a member of management (a branch manager, assistant manager, or operations specialist).  (Lewis Dep. 38–39, 45, Ex. 3, Doc. 16 at 576–77, 583, Doc. 22 at 948–55.)  Once advised of the situation, the manager completes an "out-of-balance" audit, which generally involves the same review process described above.  (*Id*. at 38–39, 45, Exs. 2–3, Doc. 16 at 576–77, 583, Doc. 22 at PageID 933–955.)

U.S. Bank's Teller Balancing and Cash Drawer Limit Policy states that "[e]very teller must balance at the end of every business day, including research and recording of any differences," and "[r]egardless of the amount, all teller differences are documented immediately upon discovery, processed and recorded on the same day." (Speight Dep. Ex. 4, Doc. 18 at PageID 857.)  Despite the requirement that all differences be documented, several witnesses testified that there may be circumstances in which, prior to accepting a difference through the Wizard Teller program, a banker can identify the source of a problem, correct it, and update the amounts entered into the balancing program, thereby bringing the drawer into balance and obviating the need to report the difference.  Examples of mistakes that bank managers testified could be corrected by bankers and branch management without further intervention include the following:

- If a banker discovers his or her drawer is under by $20 and he or she sees $20 on the counter by the drawer, the banker can deduce that that $20 is the source of the underage

and put the cash in the drawer.[9]  (Speight Dep. 45, Doc. 18 at 775; *see also* Aardema Dep. 37–38, Doc. 15 at PageID 510–11.[10])

- If a banker has counted the cash incorrectly, they simply can enter the correct amounts into the computer.  (Bittner Dep. 28–29, Doc. 14 at PageID 399–400; Cope Dep. 32, Doc. 31 at PageID 1184.)

- If a banker makes a mistake in processing a transaction, such as giving a customer too much money or shorting a customer, and finds there error on the same day, the banker can attempt to contact the customer to correct the error.  However, if the banker cannot reach the customer, the banker should accept the difference as is, and the bank will

---

[9] When given a similar hypothetical, Regional Operations Manager Lewis answered differently, stating that the banker should accept the difference and place the $20 in the bank's internal "items not in process of clearing" or "INPOC" account, where the money would be held until further research was done to determine the source of the drawer imbalance.  (Lewis Dep. 45–46, Doc. 16 at 583–84.)

[10] Aardema, Heffernan's manager, characterized a similar scenario as a permissible correction:

> Q. So if you were – say you were auditing a drawer and it was $100 short, and when you're looking around, looking at the tickets, you see a $100 bill on the floor under the teller's drawer – can a bill fall or can it be from – can there be some problem like that that occurs?
>
> A. Yes.
>
> Q. And if that would happen when you say, oh, there's the $100, put it in the drawer, and you corrected the transaction?
>
> A. If it was in your area, if it was in your drawer that fell, yes.
>
> Q. Right. Now, would you consider that a forced banking issue or would you consider that part of auditing the drawer and making a correction?
>
> A. If you had the actual money and you put it in because it was laying by your work area, in my opinion, that would not be.
>
> Q. A forced balancing?  You think you would have identified the error and corrected it?
>
> A. Yes.
>
> Q. And as a branch manager, that's one of your responsibilities, correct?
>
> A. Well, it would be part of auditing their drawer and open a drawer, and oh, you missed this strap or these dollar bills, or like you said, this $100 bill was sitting there, did you catch this.
>
> Q. Okay. Now, as a branch manager, when you audit a drawer you find and correct a problem, do you then report that to anybody?  Do you call Tim and say hey, this drawer had an underage and so I did this?
>
> A. If it's identified the transaction, then no, because it's not off.

(Aardema Dep. 37–38, Doc. 15 at PageID 510–11.)

correct it at a later time.  (Bittner Dep. 29–30, Doc. 14 at PageID 400–01; Lewis Dep. 47, 49, Doc. 16 at 585, 587.)

- If a banker erroneously added a zero to a transaction or marked a deposit as a withdrawal, the banker could fix the error by reversing the transaction and reentering it properly. (Speight Dep. 55–57, Doc. 18 at PageID 785–87.)

If the banker and/or branch management cannot identify the cause of the overage or underage, the banker should accept the difference via the Wizard Teller program.  (*Id*. at 44–45, Doc. 18 at PageID 774–75.)  The banker also has to complete paperwork including an out-of-balance checklist and an out-of-balance sheet.  (Lewis Dep. 52, Doc. 16 at 590.)  The issue then would be reviewed by personnel in another department who may recommend a corrective action to put the drawer back in balance.  (Speight Dep. 44–45, Doc. 18 at PageID 774–75.)

While bankers are permitted to correct certain errors they discover in balancing their drawers, they are prohibited from correcting an overage or underage through the practice of "forced balancing."[11]  The only formal written description of forced balancing that the parties identify comes from a "Teller Balancing and Cash Drawer Limit Confirmation" Form, which Heffernan was required to sign each year.  (Heffernan Dep. 38, Ex. 6, Doc. 11 at PageID 81, Doc. 24 at PageID 1046.)  That form generally discusses banker balancing responsibilities, out-of-balance protocol, banker cash limits, and forced balancing.  As to forced balancing, the form states, "Force[d] Balancing, including the use of a "kitty" or "slush fund," is not permitted under any circumstances," and "[a]ny employee participating in, or having knowledge of, adjusting or

---

[11] Heffernan concedes she likely received training on forced balancing, but she could not recall the training occurred or what it entailed.  (Heffernan Dep. 37, Doc. 11 at PageID 80.)

hiding in any way an out-of-balance situation may be subject to disciplinary action, up to and including termination."  (*Id*. at Ex. 6, Doc. 24 at PageID 1046.)

Different bank employees gave somewhat different descriptions of forced balancing, but several people agreed that the practice involves adding money to, whether from a slush fund or alternative source, or taking money away from a banker's drawer in order to balance the drawer when the banker or manager cannot find a legitimate explanation for the underage/overage amount.  (*Id*. at 38, 116–18, Doc. 11 at PageID 81, 159–61; Bittner Dep. 18, 31–32, Doc. 14 at PageID 389, 402–03; Speight Dep. 44, Ex. 4, Doc. 18 at PageID 775, 857.)  Regional Vice President/Regional Operations Manager Kari Lewis and Branch Manager Aardema defined it somewhat differently as involving the manipulation of reported amounts in order to put a drawer in balance.  (Lewis Dep. 25, Doc. 16 at 563; Aardema Dep. 27, Doc. 15 at 500.)  U.S. Bank's management witnesses generally distinguished forced balancing from the act of correcting an error that the banker has found to be the cause of the difference.  (Speight Dep. at 44, 55, 87, Doc. 18 at PageID 774, 785, 817; Phillips Dep. 58, Doc. 17 at PageID 714;[12] Aardema Dep. at 37–38, Doc. 15 at PageID 510–11; Lewis Dep. at 36–37, 47-49, 52-53, Doc. 16 at 574–75, 585–87, 590–91; Bittner Dep. at 31–32, Doc. 14 at PageID 402–03.)

U.S. Bank's policies recognize and witnesses admit that "out-of-balance situations" occur in the normal course of business, and a banker difference of $50 or less will not count against bankers on performance reviews.  (Heffernan Dep. Ex. 6, Doc. 24 at PageID 1046; Speight Dep. at 47–49, Ex. 4, Doc. 18 at PageID 777–79, 857.)  When the need for discipline arises in light of more serious issues, those decisions usually are made with input from the branch manager,

---

[12] Steve Phillips, born in 1977, is the human resources manager for the instore, onsite division of U.S. Bank. (Phillips Dep. 5–6, Doc. 17 at PageID 661–62.)

11

district manager, human resources, and operations personnel.  (Speight Dep. 63, Doc. 18 at PageID 973.)  Posting an out-of-balance drawer and forcing a balance are considered two different types of procedure violation, and though they may be treated differently, disciplinary actions applicable to both violations are somewhat discretionary.  Depending on the circumstances, U.S. Bank employs a progressive discipline policy which allows an employee to have some warning and opportunity to address behavior or performance concerns before termination. (Hoke Dep. 16, Doc. 12 at PageID 264.) [13]

Typically, if dealing with an out-of-balance situation in which a banker has an unexplained difference of between $100 and $499.99 and the banker followed proper procedure requiring the banker to accept and report the difference, U.S. Bank will impose verbal counseling with documentation.  (Lewis Dep. 38–39, Ex. 5, Doc. 16 at PageID 576–77, Doc. 22 at PageID 959; *see also* Speight Dep. 49, Doc. 18 at PageID 779 (testifying that an overage or underage of $400 normally would not result in termination as long as there was no attendant policy violation such as a forced balancing).)  A difference of more than $1,000 could lead to termination. (Phillips Dep. 24, Doc. 17 at PageID 680.)  U.S. Bank's written policy prohibiting forced balancing similarly does not mandate immediate termination in the event of an infraction. (Speight Dep. Ex. 4, Doc. 18 at PageID 857; Heffernan Dep. Ex. 6, Doc. 24 at PageID 1046; Hoke Dep. 17, Doc. 12 at 265; Lewis Dep. 28–29, Doc. 16 at PageID 566–67.)

## 2. The October 2011 Heffernan/Bryant Drawer Balancing Event

On October 27, 2011, Bryant, who was working in the Sharon Woods main office, went to the Sharon Woods satellite office, where Heffernan was working, to "buy" money for the

---

[13] Daniel Hoke, born in 1969, is a divisional manager, senior vice president of U.S. Bank with management responsibility over onsite branches.  (Hoke Dep. 4, 8–9, Doc. 12 at PageID 252, 256–57.)

main office as part of her routine responsibilities as a banker.  While there, Bryant also

conducted numerous personal transactions through Heffernan, including making a deposit for

Bryant's mother, buying a money order, and buying $400 in change (*i.e.*, exchanging large bills

for small bills) for her craft business.[14]  (Heffernan Dep. at 44–45, Doc. 11 at 87–88; Bittner

Dep. 64, Doc. 14 at PageID 435.)  During the course of those transactions, Bryant "had money

and things everywhere," including "the change order she was putting in her teller drawer[,] . . .

the change that she had purchased for her craft show[,] . . . the tickets for her mom's deposit,"

and possibly "a cash deposit for her business."  (Heffernan Dep. 45, Doc. 11 at PageID 88.)  In

other words, there was "money everywhere."  (*Id.*)

      After Bryant "finally started putting things away and putting things where they

belonged," Bryant attempted to balance her own drawer, which she was required to do because

she had purchased money for the drawer.  (*Id.* at 47–48, Doc. 11 at PageID 90–91.)  Heffernan

described what next occurred as follows:

> And when she went to balance, she was over $400. And if my
> memory serves me correct, that was part of – that would have been
> money that maybe she took for that change order that she got for
> her business money.  As I said, she had money everywhere.  So she
> was having a hard time putting things – she was putting things in
> envelopes and putting things in the teller drawer, and she had stuff
> everywhere. . . .  Then I asked her if she had put all the money
> back that she had taken out, or, you know, that she had gotten.  I
> said, "Did you put your change order in your purse or did you put
> it back in your drawer?"  Well, in doing everything else and
> talking and whatever, she didn't know. . . .  And she looked in her
> purse.  She said, "I can't find an envelope in here that I put that
> money away." . . .  Now, I've known Debbie for 30-plus years and
> never doubted her, that she had taken that money inadvertently and
> put it back in her drawer again, since she couldn't find it in her

---

[14] U.S. Bank concedes that there was nothing wrong with Bryant conducting personal business at her branch.
(Bittner Dep. 64, Doc. 14 at PageID 435; Aardema Dep. 33, Doc. 15 at PageID 506; Lewis Dep. 61, Doc. 16 at
PageID 599.)

> purse. . . . I went through her teller – I counted her cash. I went
> through her tape. I did all the things that you had to do [including
> checking her tickets],[15] you know, to see if you could find any type
> of mistake.

(*Id.* at 47–49, Doc. 11 at PageID 90–92.) At that point, according to the policies discussed above, there were two routes Heffernan could have taken. She could have instructed Bryant to accept the overage and taken the necessary steps to document and notify the appropriate personnel for further investigation. Or, if she found the cause of the overage, she could correct the error. Heffernan investigated the overage, as described above, and ultimately believed that: (a) Bryant had mistakenly put the $400 change she had purchased for her personal business in the teller drawer rather than placing it in her purse; and (b) allowing Bryant to remove $400 from the drawer would constitute a proper correction of the error. (*Id.* at 53–54, Doc. 11 at PageID 96–97; *see also* Speight Dep. 94, Doc. 18 at PageID 824 (testifying that he believed that Heffernan thought she had found the source of the error and "they thought they handled it the way that they could, and . . . [Heffernan and Bryant] didn't think it was forced balancing").) Heffernan then "just forgot about the whole situation" and did not report it to her branch manager or operations specialist. (Heffernan Dep. 54, Doc. 11 at PageID 97.)

Unbeknownst to Heffernan, the money removed from the drawer did not actually belong to Bryant and the overage shown was related to a series of banking errors Bryant had made on October 27. Specifically, after an approximately two- to three-week long investigation, U.S. Bank ultimately concluded that Bryant had made two different series of banking errors leading to the overage.[16] First, Bryant processed a $200 customer deposit, and then for an unknown reason,

---

[15] *See* Heffernan Dep. 50, Doc. 11 at PageID 93.

[16] At some point during that investigation, Bryant returned the $400 to the bank. (Bittner Dep. 69, Doc. 14 at PageID 440.)

she reversed the deposit, and she did not place the reversal ticket in the correct location.  (Bittner

Dep. 57, Doc. 14 at PageID 428.)  At the end of the day, the proof department processed the

$200 deposit, even though it had been reversed, because the deposit ticket was in the proof work

but there was no reversal ticket.  (*Id*.)  The second series of errors involved a P&G voucher that

Bryant processed incorrectly.  (*Id*. at 58, Doc. 14 at PageID 429.)

  The discovery of those errors began with the CORR (Controller, Operations, Research

and Reconciliation) Department flagging certain discrepancies in Bryant's work for October 27,

2011 during the course of routine audits.  (*See id*. at 56, Doc. 14 at PageID 427.)  In November

2011, the CORR Department called Operations Specialist Bittner about the discrepancies.  (*Id*. at

56–57, Doc. 14 at PageID 427–28.)  Heffernan claims she also received a call from the CORR

Department in early November, and she called Bittner to report the inconsistencies.  (Heffernan

Dep. 54–55, Doc. 11 at PageID 97–98.)  Once advised of the situation, Bittner visited the Sharon

Woods Branch, reviewed the physical teller tapes and the online teller tapes, audited Bryant's

drawer, and talked to Bryant and Heffernan, who disclosed what they had remembered

happening on that day.  (Bittner Dep. 61–65, Doc. 14 at PageID 432–36.)  Bittner also unlocked

and sorted through the branch's shred bin, where bankers are required to dispose of any trash that

needs to be shredded, and she found some paperwork that helped explain the October 27

discrepancies:

   A. . . . I do remember going through the shred bin, and in
the shred bin I found a piece of paper that had validated the
voucher that was processed, and then also on that same piece of
paper was the reversal of the customer's deposit. . . .
   Q. And where should that paperwork have been?
   A. Any reversals that are processed on a teller's drawer
should be attached to the teller tape and kept for six months, along
with the teller tape in the branch.

> Q. Okay. And if [Bryant] had put it on the teller tape and
> when she added up the drawer probably would have figured out
> there was another explanation for the overage?
> A. Could have, yes.
> Q. But because it wasn't there, that didn't show in the audit
> of the drawer?
> A. Correct.

(Bittner Dep. 66–67, Doc. 14 at PageID 437–38.)  According to Heffernan, neither she nor

Bryant had a key to the shred bin.  (*See* Heffernan Dep. 50, Doc. 11 at PageID 93.)

Bittner conceded that there was no paperwork in the drawer that explained the $400

overage, testifying that had Heffernan and Bryant "gone through and matched up what was on

the teller tape to what physical transactions they had in front of them, they might have caught

one of the situations, the deposit situation, but I don't know that they would have caught the

voucher situation."  (Bittner Dep. 65–66, Doc. 14 at PageID 436–37.)  She also conceded that

she understood how Heffernan could have believed the $400 overage was due to Bryant

misplacing her personal money.  (*Id*. at. 66, Doc. 14 at PageID 437.)  Heffernan claims that when

she discussed the matter with Bittner and Branch Manager Aardema, she asked them if she was

"in any trouble," and they both responded, "I don't think so, I don't know why you would be."

(Heffernan Dep. 58, Doc. 11 at PageID 101.)

After conducting her investigation, Bittner forwarded her findings to her manager,

Regional Operations Manager Lewis.  Lewis concluded that Bryant's drawer should have been

$400 over, but it was not, because Bryant took the $400.  Bryant should have been over and

should have posted the difference to offset a $200 deposit error and a $200 voucher error.  In

Lewis's judgment, Heffernan did not thoroughly research the overage, because Bryant's teller

tape documented reversals that were not properly processed.  (Lewis Dep. 64–65, 67, Doc. 16 at

PageID 602–03, 605.)  Lewis advised District Manager Tim Speight of the situation, and she and Speight talked with Heffernan and Bryant.  Like Lewis, Speight concluded that Heffernan, as an assistant manager, did not look into the $400 overage as closely as she should have because she trusted Bryant, and that Heffernan should have contacted Operations Specialist Bittner the day of the overage.  (Speight Dep. 83–84, 86, Doc. 18 at 813–14, 816.)

Lewis and Speight consulted with Human Resources Manager Stephen Phillips, and Speight decided to terminate Bryant and Heffernan.   Speight summarized his conclusions and forwarded them to his manager, Vice President/Division Manager Daniel Hoke, who approved of the decision.  (Hoke Dep. 14–15, Ex. 1, Doc. 12 at PageID 262–63, Doc. 20 at PageID 889.)  Speight met with Heffernan and Bryant on December 19, 2011, and terminated their employment.

After Heffernan was terminated, U.S. Bank decided that an assistant manager was not needed at the Sharon Woods Branch because it was a small branch and did not have as much traffic as larger branches.  (Speight Dep. 32, 39, Doc. 18 at PageID 762, 769.)  Instead, they created a new banker position and hired Sharon Losekamp, born in 1960, in July 2012.  (*Id*. at 32–33, Ex. 2, Doc. 18 at PageID 762–63, 855.)  According to Defendant, Losekamp performed some of Heffernan's prior duties, but she did not have the same level of authority as an assistant manager.  (*Id*. at 33, Doc. 18 at PageID 763.)  Another banker, Mark Wilkinson, replaced Bryant.  (*Id*. at 34–35, Doc. 18 at PageID 764–65.)  A third banker, Nathalie Rocha, was hired to work at the Sharon Woods Branch in August 2012, increasing the staff count to four.  (*Id*. at 35–36, Doc. 18 at PageID 765–66.)   District Manager Speight indicated that the decision to place a fourth person at that branch had been made prior to Heffernan's termination, but the position was not

17

filled until Rocha was hired.  (*Id*.)  The basis for that decision, Speight explained, was that the bank decided there should be two people at the satellite office.  (*Id*. at 40, Doc. 18 at PageID 770.)  Later, in 2013, when another branch closed, U.S. Bank moved Assistant Manager Sheila Richards from that branch to the Sharon Woods Branch because the bank "needed to find a place for her."  (*Id*. at 31–32, Doc. 18 at PageID 761–62.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All reasonable inferences from the record must be drawn in the light most favorable to the nonmoving party, and the court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.

III.    **ANALYSIS**

Heffernan brings age discrimination claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and Ohio Revised Code Chapter 4112; disability discrimination claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (2008) ("ADAAA"), and Ohio Revised Code Chapter 4112; retaliation and interference claims under the FMLA, 29 U.S.C. § 2601, *et seq.*, and retaliation and interference claims under ERISA, 29 U.S.C. § 1001, *et seq.*  Defendant moves for summary judgment as to all claims.

A.    **Age Discrimination Claims**

Heffernan alleges that U.S. Bank treated her less favorably than similarly situated, significantly younger employees and terminated her employment on account of her age in violation of the federal and state law.  U.S. Bank moves for judgment in its favor on these claims, arguing that Heffernan cannot make a prima facie case of age discrimination and, if she could, she cannot prove that U.S. Bank's reasons for discharging her were a pretext for discrimination.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a).  Ohio's anti-discrimination statute, set forth in Ohio Revised Code Chapter 4112 prohibits employment discrimination on the basis of "race, color, religion, sex, national origin, disability, age, or ancestry."  Ohio Rev. Code § 4112.02(A).  Ohio law parallels the ADEA and

the Court will analyze the federal and state discrimination claims together. *See Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F. Supp. 2d 787, 792 (S.D. Ohio 2002).

"The burden of persuasion is on the plaintiff to show that 'age was the "but-for" cause of the employer's adverse action.'" *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). An employee alleging age discrimination can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using the *McDonnell Douglas* framework, by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying the adverse employment action. *See id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Heffernan does not claim to have direct evidence of discrimination, and the parties agree that the Court should analyze the evidence pursuant to the *McDonnell Douglas* framework.[17]

That framework requires the plaintiff to first establish a prima facie case of age discrimination. *Id.* at 283. If the plaintiff succeeds, "the defendant must 'articulate some legitimate, nondiscriminatory reason' for the termination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). "'If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext.'" *Id.* (quoting *Sutherland v. Mich. Dep't. of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)).

---

[17] Although the Supreme Court has not definitively decided whether the *McDonnell Douglas* framework applies to ADEA claims and declined to address that question in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Sixth Circuit has consistently found "the *McDonnell Douglas* framework useful in analyzing circumstantial evidence of ADEA claims." *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009). In several post-*Gross* opinions, the Sixth Circuit continued to apply the *McDonnell Douglas* framework in ADEA cases on the basis that absent any inconsistent decision of the Supreme Court or an en banc decision of the Sixth Circuit, the Sixth Circuit remains bound by its prior published decisions. *See id.*; *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 n.2 (6th Cir. 2010); *Bartlett v. Gates*, 421 F. App'x 485, 489 (6th Cir. 2010); *Johnson v. Franklin Farmers Co-op.*, No. 09-5483, 2010 WL 1994853, at *2 (6th Cir. May 19, 2010); *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 39 n.3 (6th Cir. 2009).

1.      **Prima Facie Case**

To set forth a prima facie case of discrimination using circumstantial evidence, a plaintiff must establish the four elements of the well-known *McDonnell Douglas* test: 1) that she was a member of a protected class; 2) that she suffered an adverse employment action; 3) that she was qualified for the position; and 4) that she was replaced by someone outside of the protected class or was treated less favorably than a similarly situated individual outside her protected class.  *See*, *e.g., Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009) (referring to the standard established in *McDonnell Douglas*, 411 U.S. 792); *Johnson v. University of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000) (same).  "In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person."  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).  An "age difference of ten or more years is generally considered significant."  *Blizzard*, 698 F.3d at 284 (citing *Grosjean*, 349 F.3d at 336).

U.S. Bank disputes only the fourth element, arguing that Heffernan cannot show that she was replaced by a younger employee because the bank decided they did not need an assistant manager at the Sharon Woods branch and instead hired Losekamp as a banker.  Heffernan responds that regardless of the title given to Losekamp, she was hired to replace Heffernan, she assumed all of Heffernan's duties, and she was significantly younger.

"A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."  *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *see also Grosjean*, 349 F.3d at 336.  In this case, Speight testified that in lieu of hiring an assistant

manager to replace Heffernan, the bank hired Losekamp as a banker to staff the Sharon Woods Branch.  She was a new hire who was more than ten years younger than Heffernan.  The only question is whether Losekamp was hired to perform Heffernan's duties.  Speight testified that Losekamp performed "some" of Plaintiff's duties.  However, when Heffernan asked U.S. Bank in her interrogatories to identify anybody who performed Heffernan's duties after her termination, U.S. Bank identified only Losekamp and did not identify any of Heffernan's job duties which were not being completed.  (Def. Ans. to Pl. Int. at 7, Doc. 29-1 at PageID 1137.)  The only logical conclusion to draw from that response is that Losekamp performed all of Heffernan's duties.

Defendant also maintains that Losekamp did not actually replace Heffernan because she is a banker and lacks the management authority Heffernan held, but Defendant cites no evidence elaborating on what that authority entailed and how Losekamp's position is different other than pointing to highly generalized testimony referring to managers being in charge of the operations for the branch.  (*See* Bittner Dep. 37, Doc. 14 at PageID 408.)  Given the evidence that Losekamp was able to perform all of Heffernan's duties, there is at least a question as to whether the alleged difference in authority is a distinction without meaning in Heffernan's case.  *See Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x 620, 624 (6th Cir. 2010) (finding that questions of fact existed as to whether two positions were substantially similar so that the new employee actually replaced the plaintiff where the alleged replacement employee had somewhat different responsibilities than the terminated employee but where, regardless of the employees' titles, they essentially were positioned similarly within the hierarchy of the work place.); *King v. Ferrous Processing & Trading Co.*, 11-CV-10609, 2012 WL 3870517, at *6

22

(E.D. Mich. Aug. 16, 2012), *report and recommendation adopted*, 11-10609, 2012 WL 3870418

(E.D. Mich. Sept. 6, 2012) ("Courts' analyses regarding the issue of replacement have not

focused on the titles of the positions occupied by the employees, but rather look to whether the

duties associated with the two positions are substantially similar such that it is a de facto

replacement.")  Viewing the evidence in a light most favorable to Plaintiff, the Court finds

sufficient evidence that Losekamp "replaced" Heffernan for Plaintiff to meet her burden of proof

at this stage.

### 2.    Pretext

Because Heffernan has presented a prima facie case of discrimination by circumstantial

evidence, U.S. Bank must present a legitimate non-discriminatory reason for her termination.

U.S. Bank has done so here.  Specifically, Defendant cites Heffernan's approval of Bryant's

violation of U.S. Bank's forced balancing policy and erroneous removal of money from U.S.

Bank.

The burden therefore shifts back to Heffernan to rebut U.S. Bank's argument by

introducing evidence of pretext.  "A plaintiff will usually demonstrate pretext by showing that

the employer's stated reason for the adverse employment action either (1) has no basis in fact,

(2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v.

Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).  "The three-part test need not be

applied rigidly.  Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee

for the stated reason or not?'" *Blizzard*, 698 F.3d at 285 (quoting *Chen v. Dow Chem. Co.*, 580

F.3d 394, 400 n.4 (6th Cir. 2009)).  "[T]he trier of fact may . . . consider the evidence

establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the

issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

In this case, Heffernan seeks to demonstrate pretext through the first and third methods of proof. According to the Sixth Circuit,

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are "factually false." The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity."

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal citations omitted), *overruled on other grounds by Geiger*, 579 F.3d 614.

As to the first method of proof, the Court agrees that when viewed in a light most favorable to Plaintiff sufficient evidence exists to call into question Defendant's proffered reason for terminating Heffernan. The bank claims that Heffernan approved a forced balancing of Bryant's drawer. Heffernan, in contrast, maintains that she conducted a full and proper review, determined what she believed was the source of the overage, and simply corrected the error, all in compliance with U.S. Bank's policies regarding correcting errors discovered while balancing a drawer. It was not until Operations Specialist Bittner, who had access to more information than did Heffernan and who admitted that the actual errors which led to the overage would have been difficult if not impossible for Heffernan to find, reviewed all of the records that the bank uncovered Bryant's series of banking errors.

24

There is no dispute that Heffernan erroneously concluded that Bryant accidentally had placed in the drawer the $400 cash she had from a personal transaction.  However, there are numerous questions of fact calling into question Speight's and Lewis's ultimate characterization of the removal of that $400 as forced balancing rather than a permissible attempt to correct a perceived error.  For example, there are disputed facts as to whether Heffernan's conclusion as to the cause the overage was reasonable in light of the information available to her on October 27, 2011.  Additionally, there are questions of fact as to whether, under the circumstances, the removal of the $400 actually constituted a forced balancing.  The bank's written policies describing forced balancing are somewhat vague, and the precise parameters of conduct falling under that policy are further obscured by the testimony of Defendant's own representatives.  That testimony reveals that in practice, the difference between "forcing a balance" and "correcting an error" is slim.  In fact, the only material distinction between Heffernan's handling of the overage in this case and some of the examples of permissible corrections described by bank management is that Heffernan's conclusion that she had discovered the source of Bryant's overage ultimately proved incorrect.  Under these circumstances, the difference between forcing a balance and correcting an error is so slight as to call into question whether a forced balancing actually occurred and to suggest that Speight's and Lewis's conclusion that Heffernan approved a forced balancing was both unreasonable and pretext for discrimination.

As the Court finds evidence of pretext under the first method of proof, the Court need not address Plaintiff's allegations that other employees who are substantially younger than Heffernan were treated more favorably.[18]

---

[18] Both parties devote a large portion of their pleadings to Plaintiff's alleged comparators.  Defendant's raise several objections to the relevance of the alleged comparators, arguing that Heffernan was not similarly situated to the

**B.      Disability Discrimination Claims**

Heffernan relies on circumstantial evidence to support her disability discrimination claims.  Therefore, the Court applies the same burden shifting framework described above.  *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (applying the burden-shifting framework to an ADA claim).  Additionally, as is the case with Plaintiff's age discrimination claims, the Ohio and federal anti-discrimination statutes contain similar prohibitions against disability discrimination, and Ohio courts rely on interpretations of the ADA as persuasive authority in interpreting Ohio's disability discrimination law.  *Columbus Civ. Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206–07, 82 Ohio St. 3d 569, 573 (Ohio 1998).  Thus, the Court will analyze Heffernan's disability discrimination claims under the ADA.

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to . . . discharge of employees."  42 U.S.C. § 12112(a).  There are five elements of a prima facie case of discrimination under the ADA: a plaintiff must show that (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) she was replaced or the position remained open while the employer looked for other applicants.  *Plant v. Morton Intern., Inc.*, 212 F.3d 929, 936 (6th Cir. 2000).

Defendant argues that Plaintiff cannot establish a prima facie case of disability discrimination because the continuing knee problems she describes do not rise to level of a disability as defined by the ADA.  Plaintiff argues that the question of whether the plaintiff is

---

employees in question.  Though the Court does not address those objections herein, the Court notes that they may have merit.  Accordingly, the Court will revisit those issues in the event this matter proceeds to trial.

disabled should go to a jury, noting that she had surgery on both her knees in the year prior to her termination and that "Heffernan testified that it is still very difficult for her to engage in the major life activity of walking," "that going up and down stairs is difficult," and that she "is still in significant pain when it is cold or rainy." (Doc. 29 at PageID 1109–10.)

Under the ADA, the term "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of [the allegedly disabled] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include but are not limited to walking. *Id*. at § 12102(2)(a). In her Complaint, Heffernan alleges that both that she is disabled as a result of continuing knee problems and that Defendant perceived her as disabled. However, Plaintiff does not address the perception of disability allegation in response to defendant's motion for summary judgment. Accordingly, the Court deems that allegation abandoned.

Heffernan's precise testimony about the state of her knees consisted only of the following:

- She no longer believes her knees are at risk of "giv[ing] out on" her like they were before the surgery;

- It is "still sometimes very painful if [she has] to walk a long distance;"

- "Going up and down stairs is still difficult for [her];" and

- "Cold weather affects [her knees] real bad. Cold, rainy days are really bad."

(Heffernan Dep. 96–97, Doc. 11 at PageID 139–40.)

Plaintiff cites no cases in which a court found similar conditions amount to a disability under the ADA. In contrast, Defendant cites three allegedly similar recent cases in which courts

have rejected claims involving knee injuries.  (*See* Doc. 19 at PageID 881–82 (citing *Morgan v. Goodwill Indus. of Denver, Inc.*, No. 12-CV-00274-WYD-CBS, 2013 WL 6728777, at *5 (D. Colo. Dec. 20, 2013); *Zurenda v. Cardiology Associates, P.C.*, 3:10-CV-0882, 2012 WL 1801740, at *8–9 (N.D.N.Y. May 16, 2012); and *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012)).)

In *Morgan*, the court concluded that a plaintiff's knee injury, which resulted in temporary physical limitations and work restrictions, did not rise to an impairment that substantially limited a major life activity because, under the ADA, "an employee is not disabled where the impairment is temporary or short-term."  2013 WL 6728777 at *4–5.  *Morgan* is not particularly helpful in this case because the evidence, however little there may be, indicates Heffernan's knee problems are ongoing rather than temporary.  For similar reasons, neither *Zurenda*, 2012 WL 1801740, at *8–9 (temporary knee problems experienced while recovering from surgery did not substantially affect the major life activity of working) nor *Koller*, 850 F. Supp. 2d at 513 (also addressing short-term recovery from surgery), are analogous.

The main question in this case is whether there is sufficient evidence of the severity of Heffernan's problems as to at least demonstrate a question of fact as to whether they substantially affect a major life activity.  Based on the bare facts alleged in this case and Plaintiff's failure to set forth case law supporting her position, the Court declines to find that chronic knee pain of the type alleged by Plaintiff and which does not prevent her from engaging in any type of activity amounts to a disability as a matter of law.  Even when the evidence is viewed in a light most favorable to Plaintiff, there is no evidence that Heffernan's alleged pain

substantially limits her major life activity of walking. Accordingly, Defendant is entitled to summary judgment on Plaintiff's disability discrimination claims.

### C. FMLA Interference and Retaliation

Heffernan does not dispute summary judgment on her FMLA interference claim. Accordingly, the Court turns to her retaliation claim. To establish a prima facie case of unlawful retaliation under the FMLA, Plaintiff must show that (1) she availed herself of a protected right under the FMLA, (2) Defendant knew of her exercise of a protected right, (3) she was adversely affected by an employment decision made by Defendant, and (4) there was a causal connection between the exercise of the protected right and the adverse employment action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). As to the fourth element, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

In this case, Plaintiff fails to meet that minimal burden. There simply is no evidence of a causal connection between the FMLA leave she took in 2010 and her termination a year later. Without any other evidence that could establish an inference of FMLA retaliation, the lack of temporal proximity is fatal to Heffernan's claim. *See Gaskins v. Rock-Tenn Corp*., 982 F. Supp. 2d 760, 774 (S.D. Ohio 2013) (finding that the plaintiff could not prove the causal element of his FMLA retaliation claim where he pointed to "only modest circumstantial evidence to support that claim" and plaintiff was terminated eleven months after his initial FMLA leave and seven months after that leave was reconfirmed).

### D.       ERISA Interference and Retaliation

Though Plaintiff does not explicitly concede her ERISA retaliation claim, she does not address it in her response to Defendant's motion other than to refer to it in a section heading. Because Plaintiff does not actually dispute Defendant's argument regarding the dismissal of her retaliation claim, the Court finds Defendant is entitled to summary judgment on that claim and considers only the ERISA interference claim.

"To state a prima facie case for interference under ERISA, a plaintiff must show: (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Bailey v. U.S. Enrichment Corp.*, 530 F. App'x 471, 477 (6th Cir. 2013) (citation and internal quotation marks omitted).  The Sixth Circuit has "noted that in order to show that [s]he was discharged in violation of [29 U.S.C. § 1140], a plaintiff 'must show that an employer had a specific intent to violate ERISA.'" *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992) (quoting *Rush v. United Technologies, Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir. 1991)).  "The plaintiff is not required to show that the employer's sole purpose in discharging [her] was to interfere with [her] pension benefits, but rather that it was 'a motivating factor' in the decision." *Id*.

The evidence cited by Heffernan in support of her claim that U.S. Bank terminated her in part to interfere with her attainment of benefits consists of the following:

- She had no plans to retire at age sixty-five, and because of her termination at age sixty-three, she took a reduction in her pension benefits and was unable to receive retiree health insurance benefits.  (Heffernan Dep. 119–22, Doc. 11 at 162–65.)

- Additionally, following her termination, she received incorrect information from someone in U.S. Bank's human resources department, who told her she would not forfeit her eligibility to participate in the company's retiree health insurance plan if she elected COBRA.  (*Id*. at 121, Doc. 11 at PageID 164.)  Based on that advice, she elected to take COBRA benefits and forfeited a $25,000 credit she would have had in the retiree health insurance plan.  (Id. at 122, Doc. 11 at PageID 165.)

The Court is troubled by the alleged misinformation that Heffernan received regarding her health insurance.   However, there is no evidence linking that misinformation to the decision to discharge her or to any of the decision-makers involved in her termination.  Furthermore, though Plaintiff alleged her termination caused her to take reduced pension benefits, she points to no evidence as to the actual amount of the reduction.  Moreover, she also testified that she did not believe her termination actually affected the total amount she is eligible to receive. (Heffernan Dep. 119–20, Doc. 11 at 162–63.)  Under the circumstances, Heffernan fails to demonstrate a question of fact as to whether U.S. Bank terminated her for the purpose of interfering with her benefits.  Accordingly, her ERISA interference claim cannot survive summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, DENIES Defendant's Motion for Summary Judgment as to Plaintiff's age discrimination claims and GRANTS Defendant's Motion as to all other claims.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court